Dustin Lance, Bar No. 8804
dlance@lanceandrewlaw.com
Jessica A. Andrew, Bar No. 12433
jandrew@lanceandrewlaw.com
**LANCE ANDREW, P.C.**
15 West South Temple, Suite 1650
Salt Lake City, Utah 84101
Office: (801) 869-6800
Facsimile: (801) 869-6801
***Attorneys for Plaintiff***

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
CENTRAL DIVISION**

| | |
|---|---|
| JACOB SEAN BARBEN, <br><br>      Plaintiff, <br><br> v. <br><br> FEDERAL CARTRIDGE COMPANY, a Minnesota Corporation. <br><br>      Defendant. | **MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** <br><br><br> Case No.:  1:16-cv-00094-BCW |

**INTRODUCTION**

This is a products liability action arising out of a defective shotgun shell designed, manufactured and sold by Defendant Federal Cartridge Company.  The plastic hull of the shell separated from its metal head—a known phenomenon called a hull separation—while being ejected from a gun, with the plastic hull (and possibly other shell contents) remaining in the barrel of the gun and causing an obstruction unknown to Plaintiff Jake Barben.  When Jake loaded another shell and fired, the second shell struck the obstruction created by the first,

1

defectively separated shell, causing the force of the shot to explode out the side of the barrel, causing serious injuries to Jake's left hand.

Defendant seeks summary judgment on all of Plaintiff's causes of action, contending that Plaintiff is required to prove what specific defect in the shell caused the hull separation.  Where the uncontroverted facts establish that no other explanation exists for the explosion than a hull separation, and where a non-defective shotgun shell does not experience a hull separation, the fact of a defect has been proved, and further proof of the specific defect is not required. Defendant's motion should be denied.

### RESPONSE TO DEFENDANT'S STATEMENT OF FACTS

**Section I**

1.    Undisputed.

2.    Undisputed.

3.    Disputed and incomplete.  Mr. Roster testified that he did not know of a design defect, but that the fact of a hull separation is proof of a defect.[1]

4.    Disputed.  Plaintiff's evidence is that the hull separated from the metal head, a condition that does not arise but for a defect in the shell.[2]

**Section II**

1.    Undisputed.

2.    Disputed and incomplete.  That Mr. Roster did not see a difference with other shells is the problem.  There is no way for him to determine how the

---

[1] Deposition of Tom Roster, 193:4-14, 231:10-12.  Referenced portions attached hereto as Exhibit 1.

[2] *Id.*

shell that became separated is different from other shells because the shell was destroyed in the very explosion its defect caused.[3]

3.      Disputed and incomplete.  Mr. Roster obviously did not see the shell leave the factory, but he did examine the other shells in the box from which the shell was taken, and they appeared to be standard shells.[4]  That he cannot say what caused the hull separation is the central issue in this motion.  He cannot say what caused it because the evidence was destroyed by its own defect, and he need not determine what specific defect caused the hull separation in order for Plaintiff to prevail on his claims because the fact that the hull separated from the metal head can only mean that the shell was defective.[5]

4.      Disputed and incomplete.  Plaintiff's evidence of the defect is circumstantial and admissible.  That Defendant wishes to ignore the physical and testimonial evidence available to it and instead manufacture alternative facts to suit its defense has no bearing on the sufficiency of Plaintiff's evidence.

**Section III**

1.      Undisputed.

2.      Disputed and incomplete.  There were no warnings provided by Defendant concerning the danger of hull separation.[6]  Moreover, a warnings expert concerning the absence of a common sense warning is not necessary.

3.      Undisputed.

4.      Undisputed, but irrelevant for purposes of a warnings claim.  That Jake Barben is an experienced sportsman does not mean he has the same level of

---

[3] Roster depo (Ex. 1), 193:4-14.
[4] *Id.* at 186:3-17.
[5] *Id.* at 193:4-14, 231:10-12.
[6] *Id.* at 214:17-215:1.

knowledge concerning ammunition as the ammunition manufacturer, which, for purposes of a warnings defect claim, is the material point.

5.      Undisputed.

6.      Undisputed.

7.      Disputed and incomplete.  Jake Barben did not know that a hull separation could occur.

8.      Undisputed, but irrelevant.  Plaintiff's warnings claim has nothing to do with warning about obstructions.  An obstructing hull can often not be seen because the side of the hollow hull is flush with the side of the barrel.[7]  The warnings defect is the lack of any warning that a shotgun shell could experience a hull separation, and it is undisputed that Defendant provided no such warning.[8]

9.      Undisputed, and irrelevant.  Plaintiff's warnings claim has nothing to do with warning about obstructions.  An obstructing hull can often not be seen because the side of the hollow hull are flush with the side of the barrel or can't be seen without disassembling and/or unloading the shotgun.[9]  The warnings defect is the lack of any warning that a shotgun shell could experience a hull separation, and it is undisputed that Defendant provided no such warning.

10.      Undisputed and irrelevant.  Plaintiff's warnings claim has nothing to do with warning about obstructions.  An obstructing hull can often not be seen because the side of the hollow hull are flush with the side of the barrel or can't be seen without disassembling and/or unloading the shotgun.[10]  The warnings

---

[7] Roster depo (Ex. 1), 96:14-97:2.
[8] *Id.* at 214:17-215:1.
[9] *Id.* at 96:14-97:2.
[10] Roster depo (Ex. 1), 96:14-97:2.

defect is the lack of any warning that a shotgun shell could experience a hull separation, and it is undisputed that Defendant provided no such warning.

11.     Undisputed and irrelevant.  Plaintiff's warnings claim has nothing to do with warning about obstructions.  An obstructing hull can often not be seen because the side of the hollow hull are flush with the side of the barrel or can't be seen without disassembling and/or unloading the shotgun.[11]  The warnings defect is the lack of any warning that a shotgun shell could experience a hull separation, and it is undisputed that Defendant provided no such warning.

**Section IV.**

1.     Undisputed.

2.     Undisputed, but incomplete.  Mr. Roster also testified that a hull separation does not occur in the absence of a defect.[12]  That he has no way of knowing what precise defect it was that caused the hull separation does not mean there was not a defect, nor that Plaintiff has not met his burden of proof.

3.     Undisputed.

4.     Disputed.  Defendant's shells have separated.[13]

5.     Disputed.  Mr. Roster testified that a hull separation does not occur in the absence of a defect,[14] and a defect is evidence of negligence.

**Section V**

1.     Undisputed.

2.     Undisputed, and irrelevant.  This case concerns a product indisputably designed, manufactured and sold by Defendant as merchantable

---

[11] *Id.* at 96:14-97:2.
[12] *Id.* at 193:4-14, 231:10-12.
[13] Affidavit of Tom Roster, ¶ 2.
[14] Roster depo (Ex. 1), 193:4-14, 231:10-12.

and fit for a particular purpose.  Mr. Roster testified that the product was defective.[15]  A defective product is neither merchantable nor fit for its particular purpose, and expert testimony is not required.

      3.      Undisputed.

      4.      Disputed.  This case concerns a product indisputably designed, manufactured and sold by Defendant as merchantable and fit for a particular purpose.  Mr. Roster testified that the product was defective.[16]  A defective product is neither merchantable nor fit for its particular purpose, and expert testimony is not required.

## STATEMENT OF MATERIAL FACTS

### *Federal shotgun shells*

      1.      Defendant Federal Cartridge Company manufactures shotgun shells, including 12-gauge shells for use in 12-gauge shotguns.[17]

      2.      Federal 12-gauge shells have a deep red or maroon plastic hull.[18]

      3.      By contrast, Federal 20-gauge shells have a yellowish plastic hull.[19]

      4.      Shotgun shells consist of a plastic hull and a metal head with a primer.  These are attached to each other by a process of crimping the metal to the plastic.  The shells contain a powder charge, a wad and shot cup, and bb's.  The end of the plastic hull is folded to contain the bb's. [20]

      5.      Upon firing, the primer ignites the powder charge, which shoots the wad/cup and bb's out through the folded plastic end of the shell, expelling the

---

[15] Roster depo (Ex. 1), 193:4-14, 231:10-12.
[16] *Id.*
[17] Deposition of Jacob Barben, 16:8-18.  Referenced portions attached hereto as Exhibit 2.
[18] *Id.* at 80:2-4; Photo 16 from Exhibit 14 to Roster depo, attached hereto as Exhibit 3.
[19] Barben depo (Ex. 2), 33:4-15.
[20] Roster depo (Ex. 1), 90:14-91:18.

shell contents but leaving the plastic hull and metal head of the shell otherwise intact in the chamber.[21]

### *Ejecting the shotgun shell and reloading*

6.     Jake Barben was shooting a Beretta Silver Pigeon shotgun at the time of the explosion.[22]

7.     The Silver Pigeon is a double-barrel, over-under shotgun, meaning two shells can be loaded and shot consecutively.[23]

8.     Jake's practice was to shoot the lower barrel first because it had a choke tube more appropriate for closer shots.  The upper barrel has a choke tube more appropriate for further distance shots.[24]

9.     Some types of shotguns do not allow for the sportsman to check down the barrel, such as an automatic shotgun, or pump-action shotguns without disassembling the shotgun, special tools, unloading the shotgun, or both.[25]

10.    The Silver Pigeon is a break-action shotgun, meaning spent shotgun shells are ejected from the barrels by "breaking" the gun at a hinge action where the barrels meet the gun receiver, exposing the chambers and automatically ejecting the spent shell by catching the lip of the brass head and flinging it free of the chamber as the two sides of the gun separate at the hinge.[26]

11.    A sportsman ejecting spent shotgun shells typically pays no mind to the spent shell being ejected.  The process occurs quickly and generally automatically, and the point is to clear the spent shell so as to reload a new shell

---

[21] Affidavit of Tom Roster, ¶ 4.  Attached hereto as Exhibit 4.
[22] Barben depo (Ex. 2), 16:8-18.
[23] *Id.* at 30:14-18.
[24] *Id.* at 51:13-19; 144:16-21.
[25] *Id.* at 218:8-18; Roster depo (Ex. 1), 97:11-25.
[26] *Id.* at 75:19-76:6, 80:24-81:7; Barben depo (Ex. 2), 54:12-21.

quickly to re-fire.[27]  A spent shell is no danger, while a new shell can be, so the sportsman's focus is properly on simply and completely clearing the old shell so as to make room to carefully load the new shell.[28]

### *Hull separation*

12.     It has long been known to ammunition manufacturers that the plastic tube or hull of a shotgun shell can separate from the metal head during discharge, a phenomenon known as "hull separation."[29]

13.     Federal knew or should have known about hull separation events at the time of Jake Barben's injury because hull separations have been written about for years in popular shotgunning periodicals and books and are commonly discussed among trap and skeet shooters.  While relatively rare, they have occurred to all shotshell manufacturers Plaintiff's expert has consulted for, including Federal.  Given the close association among shotshell manufacturers and the common transfer of employees from one company to another, Plaintiff's expert finds it impossible that Federal would not know about the phenomenon of hull separations.[30]

14.     Plaintiff's expert has seen this phenomenon personally and has worked with and heard from others who have experienced it as well,[31] including with Federal ammunition.  Plaintiff's expert has personally experienced at least a

---

[27] Roster depo (Ex. 1), 75:19-76:6.
[28] *Id.* at 94:1-25.
[29] *Id.* at 149:10-12; Roster Affidavit (Ex. 4), ¶ 1.
[30] *Id.* at ¶ 3.
[31] Roster depo (Ex. 1), 149:10-24.

dozen hull separations with Federal shotshell hulls and has retained physical examples of some of these.[32]

15.    A non-defective shotgun shell does not have a hull separation during discharge.[33]

16.    Federal represents when they sell their shotgun shells that the consumer doesn't have to do anything to prepare the shell for safe firing except properly load the shell.  That is, Federal, as the manufacturer, has done everything necessary to allow for safe shooting of their shells before the shell gets to the hand of the sportsman; nothing further need be done to the shell by the sportsman.[34]

17.    Federal issued no warnings whatsoever concerning hull separation.[35]

### *Jake Barben's experience with shotguns*

18.    Jake Barben is an experienced sportsman and has shot shotguns— including his Beretta Silver Pigeon shotgun[36]—on hundreds of occasions.[37]

19.    Jake is so experienced with shotguns that he has been invited to act as a "face" of Browning shotguns, even appearing in some of their advertising materials.[38]

---

[32] Roster depo (Ex. 1), 150:6-19; Roster Affidavit (Ex. 4), ¶ 2.
[33] Roster depo (Ex. 1), 231:10-12; Roster Affidavit (Ex. 4), ¶ 6.
[34] Roster depo (Ex. 1), 253:23-254:16.
[35] *Id.* at 96:14-97:2.
[36] Barben depo, 48:25-49:4.
[37] *Id.* at 22:17-23:3, 23:21-25 (Jake learned to shoot at the age of eight and first shot a shotgun at the age of 15), 26:17-20 (Jake obtained his hunter safety certificate in 1994), 27:15-18 (Jake is a distinguished graduate from Front Sight Firearms Training in Las Vegas), 28:20-29:9 (Jake's father taught him about reloading shotguns and the proper functionality of ammunition).
[38] *Id.* at 39:18-41:12

20.    Jake is very familiar with the different types of ammunition for shotguns.  He is well aware of the difference between a 12-gauge shell and a 20-gauge shell.[39]

21.    Jake is also very familiar with the "feel" of his shotguns, and takes meticulous care to ensure that when something feels off, he stops and checks things out before firing again.[40]

**The "12/20" hypothesis**

22.    When one attempts to load a 20-gauge shell into a 12-gauge Beretta Silver Pigeon shotgun, the shell does not fit properly in the chamber.  A 20-gauge shell is much smaller than a 12-gauge shell, and so it would drop down further, approximately three and a half inches, into the barrel of the shotgun.  It is evident to any experienced sportsman that the 20-gauge shell does not properly fit in a 12-gauge shotgun barrel.[41]

23.    A 20-gauge shell would, by reason of its smaller size, move so far down into the barrel, that the gun's firing pin could not fire it, as nothing would hold the smaller shell in place sufficient to fire.[42]  Therefore, the only way a 20-gauge shell could be implicated in this case would be if Jake shot a 12-gauge shell, broke the action to eject the spent shell, then loaded a 20-gauge shell, attempted to fire it, was unable to fire it, broke the action again and loaded a 12-gauge shell while the 20-gauge was still in the gun, fired it, and the bb's hit the 20-gauge shell, which would explode out the side of the barrel.[43]

---

[39] Barben depo (Ex. 2), 28:20-29:9.
[40] *Id.* at, 52:14-24.
[41] Roster depo (Ex. 1), 125:15-126:23.
[42] *Id.* at 247:10-17.
[43] Barben depo (Ex. 2), 179:17-180:16; Roster depo (Ex. 1), 246:23-248:10.

24.     Not all of the components of the 12-gauge shell are red.  They can be different colors.  The paper wad that separates the powder from the plastic wad cup in the Federal ammunition at issue in this case is tannish in color.[44]

### The shotgun shells used on the day of the explosion

25.     Jake Barben and his colleagues purchased a factory-sealed case of 12-gauge Federal shells for use in a shooting activity about a week before the explosion.[45]  The box had no other shells except the 12-gauge Federal shells that came originally in the box, and the box had been in Jake Barben's gun safe for that week.[46]

26.     Jake's group purchased no other shells the day of the explosion, either 20-gauge or any other size or make, and no one in Jake's group brought any other shotgun shells that day, either 20-gauge or any other size or make.[47]

27.     All but one of the shooters that day were using Jake's own guns,[48] and neither Jake Barben nor any of the other shooters even own a 20-gauge shotgun.[49]  The other shotgun used that day was also a 12-gauge gun.[50]

28.     When the group arrived, everyone grabbed a handful of the shells from the previously factory-sealed case to carry with them as they hunted.[51]

29.     Jake put his handful of shells in his specially designed jacket pocket, which had no other ammunition in it.[52]

---

[44] Roster Affidavit (Ex. 4), ¶ 5.
[45] Barben depo (Ex. 2), 68:6-24, 70:18-23.
[46] *Id.* at 158:25-159:17.
[47] *Id.* at 76:1-7, 76:17-77:7, 143:19-144:1.
[48] *Id.* at 77:16-21.
[49] *Id.* at 31:17-25, 139:10-11.
[50] *Id.* at 77:4.
[51] *Id.* at 71:21-72:2.
[52] *Id.* at 76:8-12, 156:17-21, 158:3-24.

### *Jake's shots*

30.     As they began the hunt, Jake pulled two maroon Federal shells from his pocket and loaded the two shells in the two barrels of his double-barrel shotgun.[53]

31.     A bird flushed near Jake and one of his companions.  Both fired at the bird, and it was hit.  Jake shot at the bird out of his lower barrel.[54]  Nothing felt amiss about the shot to Jake.  It felt the same as when he had shot the Silver Pigeon many times before.[55]

32.     As was his normal practice, Jake broke the action of his shotgun to eject the spent shell from the lower chamber.[56]

33.     Jake did not watch the spent shell eject, but knew that it did, as he saw that the chamber was clear.[57]

34.     He loaded another Federal 12-gauge shell and checked to see that the shell was properly loaded and saw that the shell fit perfectly, then closed the action.[58]

35.     After walking a few yards, another bird flushed, Jake fired again, and the shot exploded out the left side of the barrel with a strange recoil, severely injuring Jake's left hand.[59]

---

[53] Barben depo (Ex. 2), 80:2-4, 81:7-24.
[54] *Id.* at 80:23-81:2.
[55] *Id.* at 81:3-6, 88:11-15, 167:5-14.
[56] *Id.* at 91:9-22.
[57] *Id.*
[58] *Id.* at 82:2-6, 168:22-25.
[59] *Id.* at 80:7-21, 87:14-22.

36.     All of the witnesses present that day affirm that Jake shot twice and broke the action just once between his two shots.  There were no "false" shots or strange attempted shots at any time.

37.     All of the witnesses present that day affirm that the only ammunition present was the 12-gauge ammunition from the box purchased the week prior.[60]

### Physical evidence

38.     Immediately after Jake was injured, the hunting guide, Stephanie, carefully removed the "live" shotgun shell from the top chamber of Jake's gun to make the gun safe, but the gun fell apart in her hands due to the extensive damage to the gun.[61]

39.     Law enforcement arrived on the scene, took statements from the witnesses, and gathered all of the exploded shotgun parts that could be found with a cursory search.[62]

40.     A few months after Jake's injury, Jake and others returned to the scene on two occasions to conduct an extensive search for any possibly relevant evidence.  They even brought a metal detector to look for some of the gun's missing pieces.[63]

41.     During one of these excursions, someone found a Federal shotgun shell plastic hull, which was separated from its metal head, and which was

---

[60] *See* Affidavit of Brian Smith, ¶¶ 3-7, attached hereto as Exhibit 6; Affidavit of Mark Braddy, ¶¶ 3-7, attached hereto as Exhibit 7.  Affidavits from other witnesses forthcoming.
[61] Barben depo (Ex. 2), 175:11-178:12.
[62] *Id.* at 176:1-7.
[63] *Id.* at 208:3-209:16.

crumpled up on the end that would normally be attached to the metal head.[64]
The crumpled up end also had many small, circular indentations that appear to
have been made by bb's fired from a shotgun shell.[65]

42.    The damage to the end of the hull that would be attached to the
metal head was extensive and disallowed investigation into how it was held in
place.[66]

43.    The metal head that separated from the hull found at the scene was
never found, and without it, it is impossible to say precisely why or how the hull
separation occurred.[67]

**The experts in this case.**

*Plaintiff's expert*

44.    Plaintiff's expert, Tom Roster, reviewed and considered all the
evidence, including all the physical evidence, and the observations and testimony
of witnesses at the scene, in order to understand the entire sequence of events
concerning Jake's shots and determine what possible scenarios could account for
the explosion.[68]

45.    As relevant to Mr. Roster's conclusions, the physical evidence
included the shotgun, including its failure point, and measurements taken
thereof, the ammunition box purchased on the day of the hunting party,
including measurements and investigation of one of the rounds from the box,
shotgun shell components recovered from the scene of the explosion, including

---

[64] *Id.*; Roster depo (Ex. 1), 144:20-145:15.
[65] Roster depo (Ex. 1), 256:23-257:12, 160:7-161:19.
[66] *Id.* at 185:5-16.
[67] *Id.* at 193:4-7.
[68] Roster expert report, 1, 10-11.  Attached hereto as Exhibit 5.

the spent hull from Jake's second shot, which was removed from Jake's gun by the hunting guide immediately after the explosion, and a plastic hull, separated from the metal head, bearing impressions that appear to even the naked eye to have been created by the plastic hull being struck by a group of bb's.[69]

46.    As relevant to Mr. Roster's conclusions, the testimonial evidence from all witnesses at the scene was perfectly consistent, among all six present individuals, that Jake shot from his lower barrel, then broke the action once to eject the spent shell from the lower barrel, reloaded the lower barrel, closed the action, walked a short distance, and fired the shot that exploded.[70]

47.    Mr. Roster concluded that the physical and testimonial evidence is both consistent and compelling, such that it allows for no other conclusion than that the first Federal shell Jake fired was defective and experienced a hull separation, which allowed the plastic hull (and possibly other shell components) to become lodged in the barrel of the shotgun instead of being expelled with the metal head when Jake broke the action after his first shot.  This obstruction was then struck by Jake's second shot, causing the shot to explode out the side of the barrel.[71]

48.    Mr. Roster considered the possibility that Jake loaded a 20-gauge shell instead of a 12-gauge shell and concluded that this was not only inconsistent with the physical evidence, but it was impossible in light of the undisputed sequence of events, as attested by all of the witnesses.[72]

---

[69] Roster Report (Ex. 5), 1, 10-12.
[70] *Id.* at 10-11; Brian Smith Affidavit (Ex. 6), ¶¶ 2-13; Mark Braddy Affidavit (Ex. 7), ¶¶ 2-13. Affidavits from other witnesses are forthcoming.
[71] Roster depo (Ex. 1), 88:11-89:9, 102:2-11, 160:3-161:19, 245:19-246:6.
[72] *Id.* at 246:7-248:17.

49.     In order for a 20-gauge to have been implicated in this explosion, the following things contradicted by all the evidence would have had to occur:

a.     Jake would have had to have had a 20-gauge shell with him that day, even though no one was shooting 20-gauge guns, neither Jake nor any of his companions shooting that day owned any 20-gauge guns, and no one had purchased 20-gauge shells;[73] and

b.     The sequence of events would have had to have been significantly different from the sequence recalled by all the witnesses, and contrary to common sense.   Specifically, Jake would have had to have loaded a proper 12-gauge shell, fired that shell, broke the action, loaded an improper 20-gauge shell, attempted to fire but felt a strange click of the trigger instead of a shotgun shot, not realized there was a problem even though he was an experienced sportsman and paid careful attention to the feel of his guns, broke the action a second time, loaded a proper 12-gauge shell behind the 20-gauge shell already in the chamber, and fired the shot that struck the 20-gauge shell and exploded out the side of the gun.[74]

50.     Mr. Roster concluded that the sequence of events and the examination of the unfired 12-gauge rounds and the gun, without even considering the plastic hull found separated from its metal head and riddled with bb marks, allows him to conclude with certainty that no other explanation can exist for the explosion.[75]

---

[73] Roster depo (Ex. 1), 248:1-10.
[74] *Id.* at 263:23-264:5, 265:12-266:10.
[75] *Id.* at 193:12-14.

51.     The later recovered, bb-marked plastic hull, if it was the hull from the first shot that separated and became lodged in the barrel, adds further support to his conclusion.[76]

52.     The plastic hull and metal head of a non-defective shotgun shell do not separate upon firing.[77]

53.     Mr. Roster has studied hull separation events, and in fact has saved examples of separated hulls that he has gathered over his many years as a shotgun shell expert.[78]

54.     Hull separations can occur for a few reasons.  Sometimes the metal head is not sufficiently crimped onto the plastic hull.  Sometimes upon firing, the metal head partially splits, causing it to lose its grip on the plastic hull. Sometimes there is a problem with the shape or construction of the base wad, which allows expanding powder gases to forcefully blow between the exterior of the base was and the interior of the plastic tube wall and/or interior of the metal head, causing the metal head and plastic hull to separate.  Sometimes the plastic hull can be cut or severed completely around its circumference at the top edge of the metal head's skirt.[79]

55.     A hull separation can be undetectable to a sportsman, even if he or she sights down the barrel after a shot.  The plastic hull, having discharged its contents through the front folded end of the shell, and having separated from its

---

[76] Roster depo (Ex. 1), 256:19-257:12; 244:24-245:18.
[77] *Id.* at 251:23-253:17; Roster Affidavit (Ex. 4), ¶ 6.
[78] *Id.* at 184:11-16.
[79] *Id.* at 183:15-184:16; Roster report (Ex. 5), 12-14.

metal head, becomes a cylinder, the thin sides of which conform to the barrel wall, making the barrel appear clear.[80]

56.     Mr. Roster is highly regarded in the industry, has been retained by and consulted with Federal Ammunition on many occasions, including on the design of some of its shells, and has knowledge of Federal shotgun shells that have experienced a hull separation.[81]

57.     Mr. Roster does not know precisely why this specific hull separation occurred, but he has concluded that the evidence allows for no other explanation for the incident than a hull separation.[82]

*Defendant's experts*

58.     Defendant's experts expressly refused to consider certain physical evidence, including the bb-marked plastic hull separated from its metal head that was found at the scene of the explosion.[83]

59.     Defendant's experts disregarded Jake's sworn testimony concerning the sequence of Jake's shot in forming their opinions, because had they considered the sequence of events, their theory of a 12/20 obstruction would be defeated.

60.     Defendant's experts did not even inquire as to what the other five witnesses present that day observed to determine the sequence of Jake's shots.[84]

---

[80] Roster depo (Ex. 1), 96:14-97:2.
[81] *Id.* at 16:23-17:3, 27:12-25, 29:3-32:13, 52:9-13, 237:9-239:22; Roster Affidavit (Ex. 4), ¶¶ 2-3.
[82] *Id.* at 193:12-14.
[83] Shawn Sapp Expert Report, 30 ("the 'separated hull' artifact was not collected in accordance with the recommended guidelines for forensic investigations and the collection of physical evidence provided in ASTM standards . . . , and is therefore of suspect origin and should not be regarded as valid evidence").  Attached hereto as Exhibit 8.
[84] Sapp expert report says nothing about what these witnesses saw.

61.     Defendant, who had as much access to the non-party witnesses as Plaintiff did, never deposed them, and if Defendant ever spoke with them, Defendant apparently did not provide any of that information to its experts.

62.     Defendant spent two full days paying several experts to perform forensic testing on the Berretta gun Jake Barben shot that day, including metallurgical testing, examination of the failure point with a scanning electron microscope, destructive testing of the barrel, hardness testing and other tests and examinations.  All of this testing found that nothing about the gun caused or contributed to the explosion.[85]

63.     Defendant's experts do not deny that a non-defective shotgun shell does not experience a hull separation.

64.     Instead, Defendant's experts disregard the evidence and manufacture new facts, including the existence of a 20-gauge shotgun shell that the evidence does not allow to exist, an attempted shot that no one present heard, saw or experienced that would have clicked instead of shot after loading the imagined 20-gauge shell, and an imagined second break of the action to load a 12-gauge shell behind the imagined 20-gauge.[86]

---

[85] Sapp Expert Report (Ex. 8), 4-6, 30-31 (after two days of testing, no conclusions implicating the shotgun).
[86] *Id.* at 30-31.

## ARGUMENT

### I.   Standard.

Summary judgment is only appropriate where there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[87]  Therefore, where, as here, there are material facts in dispute, summary judgment is not appropriate.

### II.   All of Plaintiff's causes of action are supported by the evidence.

All of Defendant's arguments rest on the proposition that Plaintiff's claims fail because Plaintiff cannot prove the specific defect in the shotgun shell that caused its hull separation.  This contention ignores the evidence and misstates the law.

Plaintiff has presented competent expert opinion evidence that a hull separation is the only possible explanation for the explosion in light of the uncontroverted eyewitness testimony and physical evidence (which Defendant ignores), and that the fact of a hull separation is proof that the shell was defective—a conclusion Defendant does not and cannot credibly dispute.  Said differently, the hull separation would not have occurred, and the explosion would not therefore have happened, had Defendant exercised due care in either the design or the manufacture of the shell.  A non-defective shell does not experience a hull separation.  The question that remains, therefore, is whether Plaintiff is required to prove which specific defect (i.e. a design or manufacturing defect) caused the hull separation in order to prevail on his claims.  He does not. Whether the cause of the hull separation was a defect in the shell's design or in its

---

[87] FED. R. CIV. P. 56.

manufacture is neither a factually answerable question, nor a legally necessary one.

Courts have recognized that requiring proof of a specific defect would require the plaintiff to accomplish the impossible in cases where the product is destroyed by its own defect.[88]  Seatbelts burn up.  Airplane parts are lost in the ocean.  Drugs are digested.  Shotgun shells explode and parts are lost, melted or altered.  Where products are destroyed, there may be no evidence from which to reverse-engineer their precise defect.  And in many circumstances, numerous factors that may have contributed to an incident are simply unknown or unknowable to investigators piecing together the story after the fact.  For example, in the circumstance of a hull separation obstruction burst like this, what other shell contents (i.e. shot cup/wad, etc.) remained in the barrel with the separated hull?  What was the physical shape and condition of the hull upon separation?  Did the hull, once separated, lodge in the barrel straight or at an angle?  Here, the shell hull and metal head separated—proof positive of a defective shell.  The plastic hull—and possibly other shell components—of the defective shell then lodged in the barrel of the shotgun, and the subsequent shot caused the lodged hull and the second shot to explode out the side of the barrel, breaking the shell into more pieces, melting parts, distorting parts, and leaving physical evidence that attests to the fact of the hull separation, but not its cause.

---

[88] *St. Paul Fire & Marine Ins. Co. v. Michelin Tire Corp.*, 298 N.E. 2d 289, 297 (Ill. Ct. App. 1973) ("In every products liability case there must exist some juncture beyond which a plaintiff need not and perhaps cannot be more specific. It is sufficient if, by expert opinion and/or circumstantial evidence, it appears more probable than not that the product in question contained a defect when it left the manufacturer's control and that the defect was causally connected to the injury.")

Neither the mere fact of an injury nor the failure of a product can, standing alone, prove a defect.[89]  But that does not mean that uncontroverted circumstantial evidence cannot be evidence of a defect, which is where Defendant's argument fails.  Where a product defect is the only explanation for an event, the precise nature of the defect is not a question that requires an answer because the defect can properly be inferred.  "The inference of a defect is permissible whenever the plaintiff has introduced evidence that would exclude other causes of the accident."[90]  That is because whether Defendant failed in its design of the shell or failed in its manufacture of the shell, the shell was, by reason of one of those failures, defective, and that defect is the only explanation for the explosion.  The academic exercise of ferreting out precisely which of the possible defects was the cause does not matter because in either case, Defendant is the culprit for selling the defective and unreasonably dangerous shell.

This principle manifests in legal doctrines of various names, but which lead to the same end.  For example, some jurisdictions, including Utah, apply the doctrine of *res ipsa loquitur* to both negligence and strict liability claims.[91]  "Res ipsa loquitur is essentially an evidentiary rule that allows an inference of negligence to be drawn when human experience provides a reasonable basis for

---

[89] *Burns v. Cannondale Bicycle Co.*, 876 P.2d 415, 418 (Utah Ct. App. 1994).

[90] *Weir v. Federal Insurance Co.*, 811 F.2d 1387, 1392 (10th Cir. 1987).

[91] *See, e.g.*, *King v. Searle Pharmaceuticals*, 832 P.2d 858, 861 (Utah 1992) (addressing with approval the use of *res ipsa loquitur* in the products liability context, but finding it inapplicable where the plaintiff could not prove exclusive control); *Weggeman v. Seven-Up Bottling Co.*, 93 N.W. 2d 467, 474 (Wis. 958) ("Where res ipsa applies, however, the plaintiff is not required to prove or point out a single specific defect out of several that are possible. Where any one of several types of defect may have caused the accident the jury may infer negligence on the part of defendant in issuing a defective product, without pinpointing the specific defect."); *Lee v. Crookston Coca-Cola Bottling Co.*, 188 N.W. 2d 426, 434 (Minn. 1971) ("under the theory of strict liability plaintiff should not be required to prove specifically what defect caused the incident, but may rely upon circumstantial evidence from which it can reasonably be inferred that it is more probable than not that the product was defective when it left defendant's control.").

concluding that an injury probably would not have happened if due care had been exercised."[92]  Application of the doctrine requires proof that (1) the incident was such that it would not have happened but for a defect in the product, (2) the product was under the exclusive management or control of the manufacturer at the relevant time, such as when the product is being designed or manufactured, and (3) the plaintiff didn't do something to the product that caused the incident.[93]  Other jurisdictions prefer not to apply the *res ipsa* doctrine to strict liability causes of action, so they have adopted the "malfunction doctrine," sometimes called the "indeterminate products test,"[94] which is presented in the Restatement (Third) of Torts:  Product Liability § 3, and under which the same principle applies:

> It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the incident that harmed the plaintiff: (a) was a kind that ordinarily occurs as a result of product defect; and (b) was not, in the particular case, solely the result of causes other than product defect existing at the time of sale or distribution.[95]

Each of these doctrines get to the same point, which is that in cases where a plaintiff can prove that the accident would not have occurred without the presence of a defect, and that the manufacturer of the product is the only one in a position to have influenced the state of the product sufficient to cause the

---

[92] *King*, 832 P.2d at 861, citing *Ballow v. Monroe,* 699 P.2d 719, 721 (Utah 1985); *see also Anderton v. Montgomery,* 607 P.2d 828, 833-34 (Utah 1980) (overruled on other grounds in *Randle v. Allen*, 862 P.2d 1329 (Utah 1993).

[93] *King*, 832 P.2d at 861.

[94] *See Myrlak v. Port Authority of New York and New Jersey*, 723 A.2d 45, 55 (N.J. 1999).

[95] *Hartford Fire Ins. Co. v. Dent-X Intern, Inc.,* 2007 WL 911841 *3-4 (D. Conn. 2007).  *See also Tolman v. Stryker Corp.*, 640 F. App'x 818, 819 (10th Cir. 2016) (in the absence of evidence of a specific defect, a plaintiff may still make a prima facie case by relying on an inference of defect, by proving that the product's failure occurred "in the absence of . . . reasonable secondary causes"), quoting *Sims v. Gen. Motors Corp.*, 751 P.2d 357, 361 (Wyo. 1988).

accident, a plaintiff may present a prima facie case of defect by circumstantial evidence without proving the specific defect.

"[T]o meet their burden of proof, the plaintiffs must provide sufficient evidence raising a reasonable inference from which the fact finder may rationally conclude that plaintiff[s'] injuries and damages proximately resulted from the product's failure of performance causally related to its defective condition."[96] That is the law, and Plaintiff's evidence satisfies it.

## CONCLUSION

Defendant is strictly liable for its defective and unreasonably dangerous shotgun shell that experienced a hull separation.  Defendant was negligent, either in its design or its manufacture of the shell, whichever caused the hull separation, and certainly in its failure to warn that hull separations can occur.  Defendant warranted that its shotgun shell was merchantable and fit for its particular purpose, but its defective and unreasonably dangerous shotgun shell that separated, caused an obstruction and then an explosion, in fact was neither merchantable nor fit for its particular purpose.  Defendant cannot escape liability for its defective product, its negligence or its breach of warranties at the summary

---

[96] *Burns v. Cannondale Bicycle Co.*, 876 P.2d 415, 418 (Utah Ct. App. 1994), quoting *Brooks v. Colonial Chevrolet-Buick, Inc.*, 579 So.2d 1328, 1332 (Ala. 1991), which quoted *Sears, Roebuck & Co. v. Haven Hills Farm, Inc.,* 395 So.2d 991, 995 (Ala.1981) (internal quotations omitted).  As related to warranty claims, *see also Valentine v. Ormsbee Exploration Corp.*, 665 P.2d 452, 462 (Wyo. 1983) ("Proof of the specific defect in construction or design causing a mechanical malfunction is not an essential element in establishing breach of warranty. When machinery 'malfunctions,' it obviously lacks fitness regardless of the cause of the malfunction. Under the theory of warranty, the 'sin' is the lack of fitness as evidenced by the malfunction itself rather than some specific dereliction by the manufacturer in constructing or designing the machinery. . .  A prima facie case that a product was defective and that the defect existed when it left the manufacturer's control is made by proof that in the absence of abnormal use or reasonable secondary causes the product failed to perform in the manner reasonably to be expected in light of [its] nature and intended function." (internal citations and quotation omitted)).

judgment stage by ignoring the uncontroverted physical and testimonial evidence proving its liability for selling a defective product, and instead demanding that Plaintiff prove the unprovable details of the defect that the facts already prove exists. These are issues of fact for the jury to decide, and Defendant's motion should be denied.

Dated this 26th day of October. 2017.          LANCE ANDREW, P.C.

                                                 /s/ Jessica Andrew       .

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of October, 2017, I caused a true and correct

copy of the foregoing to be filed via ECF, which sent notice of the same to the

following:

Scott T. Evans
Tyler V. Snow
CHRISTENSEN & JENSEN, P.C.
257 East 200 South, Suite 1100
Salt Lake City, UT 84111
Scott.evans@chrisjen.com
Tyler.snow@chrisjen.com
*Attorneys for Defendant Federal
Cartridge Company*

/s/ Jessica Andrew