# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| JACOB SEAN BARBEN,<br><br>           Plaintiff,<br><br>v.<br><br>BERETTA USA CORP., a Delaware Corporation; SPORTSMAN'S WAREHOUSE, INC., a Utah Corporation; and FEDERAL CARTRIDGE COMPANY, a Minnesota Corporation,<br><br>           Defendants. | **MEMORANDUM DECISION AND ORDER ON FEDERAL CARTRIDGE COMPANY'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:16-cv-00094-DN<br><br>District Judge David Nuffer |

This case arises from injuries Plaintiff Jacob Sean Barben sustained when his shotgun's barrel burst upon firing.[1] Mr. Barben asserts claims against Defendant Federal Cartridge Company ("Federal Cartridge") for strict liability (defective manufacture, design, and warning), negligence, and breach of express and implied warranties.[2] Federal Cartridge seeks summary judgment on each of Mr. Barben's claims.[3]

Because genuine issues of material fact exist regarding Mr. Barben's claims for strict liability (defective manufacture) and breach of implied warranty, Federal Cartridge's Motion for Summary Judgment[4] is DENIED in part. However, because the undisputed facts demonstrate

---

[1] Second Amended Complaint ("Complaint"), docket no. 2-2, filed June 29, 2016.

[2] *Id*. ¶¶ 32-47.

[3] Federal Cartridge Company's Motion for Summary Judgment ("Motion for Summary Judgment"), docket no. 32, filed Sept. 29, 2017.

[4] *Id*.

that Federal Cartridge is entitled to judgment as a matter of law on Mr. Barben's other claims,

Federal Cartridge's Motion for Summary Judgment[5] is GRANTED in part.

**Table of Contents**

STANDARD OF REVIEW ......................................................................................... 2
UNDISPUTED MATERIAL FACTS .......................................................................... 3
DISCUSSION ............................................................................................................ 13
    Genuine issues of material fact preclude summary judgment on Mr. Barben's strict
        liability (defective manufacture) and breach of implied warranty claims ........... 14
    Federal Cartridge is entitled to summary judgment on Mr. Barben's strict liability
        (defective design) claim ...................................................................................... 17
    Federal Cartridge is entitled to summary judgment on Mr. Barben's strict liability
        (defective warning) claim .................................................................................... 18
    Federal Cartridge is entitled to summary judgment on Mr. Barben's negligence claim .. 20
    Federal Cartridge is entitled to summary judgment on Mr. Barben's breach of express
        warranty claim ..................................................................................................... 24
ORDER ...................................................................................................................... 24

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[6] A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[7] In determining whether there is a genuine dispute as to a material fact, the factual record and all reasonable inferences drawn therefrom are viewed most favorably to the nonmovant.[8]

---

[5] *Id.*

[6] FED. R. CIV. P. 56(a).

[7] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[8] *Id.*

The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[9] But "[w]hen, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."[10] "To avoid summary judgment, the nonmovant must [then] establish, at a minimum, an inference of the presence of each element essential to the case."[11]

**UNDISPUTED MATERIAL FACTS**[12]

1.    Shotgun shells consist of a plastic hull and a metal head with a primer. These are attached to each other by a process of crimping the metal head to the plastic hull. The shells contain a powder charge, a wad and shot cup, and bbs. The end of the plastic hull is folded to contain the bbs.[13]

2.    Upon firing, the primer ignites the powder charge, which shoots the wad and shot cup the bbs through the folded end of the plastic hull, expelling the shell's contents out the shotgun's barrel but leaving the plastic hull and metal head otherwise intact in the shotgun's chamber.[14]

---

[9] *Id.* at 670-71.

[10] *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (internal quotations omitted).

[11] *Id.*

[12] The parties' briefing includes several purported undisputed material facts that are not included here because they are either not material to the resolution of the Motion for Summary Judgment, not supported by the evidence, inadmissible, disputed, or are argument, not facts.

[13] Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Opposition") at 6, ¶ 4, docket no. 35, filed Oct. 26, 2017 (citing Deposition of Thomas A. Roster dated May 23, 2017 ("Roster Deposition") at 90:14-91:18, docket no. 32-4, filed Sept. 29, 2017).

[14] *Id.* at 6-7, ¶ 5 (citing Affidavit of Tom Roster ("Roster Affidavit") ¶ 4, docket no. 35-4, filed Oct. 26, 2017).

3.      It has long been known to ammunition manufacturers that the plastic hull of a shotgun shell can separate from the metal head during discharge, a phenomenon known as "hull separation."[15]

4.      Federal Cartridge manufactures shotgun shells, including 12-gauge shells for use in 12-gauge shotguns.[16]

5.      Since 2010, Federal Cartridge has manufactured over 130 million H121 shells. The ammunition Mr. Barben was using at the time of the barrel explosion was a Federal Cartridge H121 6 shell, of which sub-type over 30 million shells were manufactured.[17]

6.      Of the 130 million H121 shells that Federal Cartridge manufactured since 2010, there are no reports of any other alleged hull separations from either internal testing or external field complaints with H121 ammunition.[18]

7.      The packaging for Federal Cartridge's H121 6 ammunition states:

WARNING: to avoid serious injury . . . (2) always be sure barrel is free of any obstructions; the barrel should be checked in case of light recoil, or an unusually loud or weak sound heard during firing.[19]

8.      Mr. Barben is an experienced sportsman and has shot shotguns, including his Beretta Silver Pigeon shotgun.[20]

9.      Mr. Barben is very familiar with the different types of ammunition for shotguns.[21]

---

[15] *Id*. at 8, ¶ 12 (citing Roster Affidavit ¶ 1).

[16] *Id*. at 6, ¶ 1 (citing Deposition of Jacob Sean Barben dated May 23, 2016 ("Barben Deposition") at 16:8-18, docket no. 32-6, filed Sept. 29, 2017).

[17] Motion for Summary Judgment at 9, ¶ 3 (citing Expert Analysis and Report of Steve Rodgers ("Rodgers Report") at 2-3, Exhibit B, docket no. 32-9, filed Sept. 29, 2017).

[18] *Id*. at 9, ¶ 4 (citing Rodgers Report at 3).

[19] *Id*. at 7, ¶ 8 (citing Photographs of Product Packaging, docket no. 32-7, filed Sept. 29, 2017).

[20] Opposition at 9, ¶ 18 (citing Barben Deposition at 48:25-49:4).

[21] *Id*. at 10, ¶ 20 (citing Barben Deposition at 28:20-29:9).

10.     Mr. Barben was shooting a Beretta Silver Pigeon shotgun at the time of the barrel explosion.[22]

11.     The Beretta Silver Pigeon is a break-action shotgun, meaning spent shotgun shells are ejected from the barrels by "breaking" the gun at a hinge action where the barrels meet the gun receiver. This exposes the chambers and automatically ejects the spent shell by catching the lip of the metal head and flinging it free of the chamber as the two sides of the gun separate at the hinge.[23]

12.     Mr. Barben learned when he was 15 years old that gun barrels can become obstructed. He testified:

> It taught me a lesson at a young age to always check and make sure your gun is in good shape before you go out and fire. So that would be something that I tried to do . . . Typically, once I am hunting and I've given my gun a look-over, I feel confident that it's in good operating procedure, if something feels off or feels different or it sounds funny, I'll check it over again, but so long as it's operating as its intended, I don't usually continue to look over my gun" because "I don't feel like I should have to . . .[24]

13.     Mr. Barben's understanding is that "[t]here's a lot of ways that things like this could cause an accident. Th[ere are] a lot of things that could cause an obstruction."[25]

14.     Mr. Barben's understanding is that "most" firearm manuals "say to check for obstructions when you're loading the shotgun." He testified that it is important to check a shotgun's barrels because "[y]ou don't want something in your barrel" because "[i]t could malfunction" and "you could get injured."[26]

---

[22] Id. at 7, ¶ 6 (citing Barben Deposition at 16:8-18).

[23] Id. at 7, ¶ 10 (citing Roster Deposition at 75:19-76:6, 80:24-81:7; Barben Deposition at 54:12-21).

[24] Motion for Summary Judgment at 7, ¶ 5 (citing Barben Deposition at 51:20-53:5).

[25] Id. at 7, ¶ 6 (citing Barben Deposition at 217:21-218:7).

[26] Id. at 7, ¶ 7 (citing Barben Deposition at 52:14-53:25).

15.     The Beretta Silver Pigeon's manual states, in the section for "LOADING AND

FIRING":

> Hold the barrels up to the light and look down the barrels to make sure that they
> are free of any obstructions.

The manual does not say it is okay to check the barrels before starting the day, or when the

operator receives an unusual report upon firing, as opposed to in-between every time that the

user is loading.[27]

16.     Mr. Barben testified as follows with respect to the Beretta Silver Pigeon's

instructions:

> I don't feel like [these warnings] are reasonable in every hunting environment . . .
> These instructions are indicating that you should look down the barrel before you
> fire a second shot. That would seem impractical to me as a hunter . . . If a hunter
> was told, 'You have to look down this barrel after every shot to fire it,' I doubt
> that that marketing campaign would be successful for Beretta or any other
> manufacturer.[28]

17.     Mr. Barben testified that, assuming there had been an obstruction, "if I looked

down the barrel [prior to shooting], I probably would have seen something there" and not fired

the shotgun.[29]

18.     Mr. Barben and his colleagues purchased a factory-sealed case of 12-gauge

Federal Cartridge shells for use in a shooting activity about a week before the barrel explosion.

The box had no other shells except the 12-gauge Federal Cartridge shells that came originally in

the box, and the box had been in Mr. Barben's gun safe for that week.[30]

---

[27] *Id*. at 8, ¶ 9 (citing Beretta Instruction Manual at BUSA (Barben) 000012, docket no. 32-8, filed Sept. 29, 2017; Barben Deposition at 217:9-19).

[28] *Id*. at 8, ¶ 10 (citing Barben Deposition at 217:15-219:3).

[29] *Id*. at 8, ¶ 11 (citing Barben Deposition at 82:21-83:14).

[30] Opposition at 11, ¶ 25 (citing Barben Deposition at 158:25-159:17).

19.    When the group arrived at the site of their shooting activity, everyone grabbed a handful of the shells from the previously factory-sealed case to carry with them as they hunted.[31]

20.    Mr. Barben put his handful of shells in his specially designed jacket pocket.[32]

21.    All but one of the shooters that day were using Mr. Barben's guns, and neither Mr. Barben nor any of the other shooters own a 20-gauge shotgun. The other shotgun used that day was also a 12-gauge shotgun.[33]

22.    As they began the hunt, Mr. Barben pulled two maroon Federal Cartridge shells from his pocket and loaded the two shells in the two barrels of his Beretta Silver Pigeon shotgun.[34]

23.    A bird flushed near Mr. Barben and one of his companions. Both fired at the bird. Mr. Barben shot at the bird out of his lower barrel. Nothing felt amiss about the shot to Mr. Barben—it felt the same as when he had shot the Beretta Silver Pigeon many times before.[35]

24.    As was his normal practice, Mr. Barben broke the action of his shotgun to eject the spent shell from the lower chamber.[36]

25.    Mr. Barben did not watch the spent shell eject, but knew that it did, as he saw that the chamber was clear.[37]

---

[31] Opposition at 11, ¶ 28 (citing Barben Deposition at 71:21-72:2).

[32] *Id*. at 11, ¶ 29 (citing Barben Deposition at 76:8-12, 156:17-21, 158:3-24).

[33] *Id*. at 11, ¶ 27 (citing Barben Deposition at 31:17-25, 77:4, 77:16-21, 139:10-11).

[34] *Id*. at 12, ¶ 30 (citing Barben Deposition at 80:2-4, 81:7-24).

[35] *Id*. at 12, ¶ 31 (citing Barben Deposition at 80:23-81:6, 88:11-15, 167:5-14).

[36] *Id*. at 12, ¶ 32 (citing Barben Deposition at 91:9-22).

[37] *Id*. at 12, ¶ 33 (citing Barben Deposition at 91:9-22).

26.     After walking a few yards another bird flushed, Mr. Barben fired again, and the shot exploded out the left side of the barrel with a strange recoil, severely injuring his left hand.[38]

27.     Immediately after Mr. Barben was injured, the hunting guide, Stephanie, carefully removed the "live" shotgun shell from the top chamber of Mr. Barben's gun to make the gun safe, but the gun fell apart in her hands due to the extensive damage.[39]

28.     Law enforcement arrived on the scene, took statements from the witnesses, and gathered the exploded shotgun parts found in their search.[40]

29.     Over seven months later, on June 3 and 12, 2015, Mr. Barben and others returned to the scene to conduct an extensive search for any possibly relevant evidence. They brought a metal detector to look for some of the shotgun's missing pieces.[41]

30.     During the June 12, 2015 excursion, someone found a Federal Cartridge shotgun shell plastic hull, which was separated from its metal head and crumpled up on the end that would normally be attached to the metal head. The crumpled-up end also had many small, circular indentations that appeared to Mr. Barben's expert witness, Tom Roster, as having been made by bbs fired from a shotgun shell.[42]

31.     The damage to the end of the plastic hull that would be attached to the metal head was extensive and disallowed Mr. Roster from investigating how it was held in place.[43]

---

[38] *Id*. at 12, ¶ 35 (citing Barben Deposition at 80:7-21, 87:14-22).

[39] *Id*. at 13, ¶ 38 (citing Barben Deposition at 175:11-178:12).

[40] *Id*. at 13, ¶ 39 (citing Barben Deposition at 176:1-7).

[41] *Id*. at 13, ¶ 40 (citing Barben Deposition at 208:3-209:16).

[42] *Id*. at 13-14, ¶ 41 (citing Barben Deposition at 208:3-209:16; Roster Deposition at 144:20-145:15, 160:7-161:19, 256:23-257:12).

[43] *Id*. at 14, ¶ 42 (citing Roster Deposition at 185:5-16).

32. The metal head that had separated from the plastic hull found at the site was never found. Without it, Mr. Roster could not say precisely why or how the hull separation occurred.[44]

33. Mr. Roster has been retained by and consulted with Federal Cartridge on many occasions, including on the design of some of its shells, and he has knowledge that Federal Cartridge's shotgun shells have experienced hull separation.[45]

34. Mr. Roster is not a warnings expert, and his expert report contains no opinions regarding a warning defect.[46]

35. Mr. Roster is not a warranties expert, and his expert report contains no opinions regarding a breach of warranty.[47]

36. Mr. Roster's expert report contains no opinion regarding a design defect or an alternative, safer design in relation to Federal Cartridge's shotgun shells. And he testified:

> There's no design defect in my opinion. It's just that when you make millions and millions of these multi-piece structures and you can have slight negatives like out-of-round base wads or things aren't crimped together quite right once in a while, once in a great while, you can have these hull separation events.[48]

37. Mr. Roster testified:

> I don't see that [the subject shell is] different from the manufacturer's design or specifications at all. I mean, it's just a typical tube that somehow unfortunately became separated.[49]

---

[44] *Id.* at 14, ¶ 43 (citing Roster Deposition at 193:4-7).

[45] *Id.* at 18, ¶ 56 (citing Roster Deposition at 16:23-17:3, 27:12-25, 29:3-32:13, 52:9-13, 237:9-239:22; Roster Affidavit ¶¶ 2-3).

[46] Motion for Summary Judgment at 6, ¶¶ 2-3 (citing Roster Deposition at 215:7-8; Tom Roster (Consultant) Final Report re Ammunition 11-20-2016 ("Roster Report"), docket no. 32-3, filed Sept. 29, 2017).

[47] *Id.* at 10, ¶¶ 2-3 (citing Roster Deposition at 221:22-222:5; Roster Report).

[48] *Id.* at 4-5, ¶¶ 2-3 (citing Roster Report; Roster Deposition at 214:8-16); Reply Memorandum in Support of Federal Cartridge Company's Motion for Summary Judgment ("Reply") at 2, ¶ 3, docket no. 38, filed Nov. 9, 2017 (citing Roster Deposition at 214:8-16).

[49] Motion for Summary Judgment at 5, ¶ 2 (citing Roster Deposition at 182:17-24).

38.     Mr. Roster does not know what the subject shell's condition was when it left the factory, and he cannot say what caused the tube to become separated.[50]

39.     Mr. Roster testified that he "ha[s] no evidence that [Federal Cartridge] didn't" use reasonable care in designing, manufacturing, testing or inspecting the subject ammunition.[51]

40.     Mr. Roster testified:

[A]t the time of his injury, [Mr. Barben] was a former employee of Sportsman's Warehouse and was a very experienced hunter and marksman. As a result, [he] had an advanced knowledge of firearms, firearm operation, and firearm safety.[52]

41.     Hull separations have been written about for years in popular shotgunning periodicals and books, and are commonly discussed among trap and skeet shooters. While relatively rare, they have occurred to all shotgun shell manufacturers Mr. Roster has consulted for, including Federal Cartridge.[53]

42.     Mr. Roster has studied hull separation events and has seen the phenomenon personally and worked with and heard from others who have experienced it as well, including with Federal Cartridge ammunition. Mr. Roster has personally experienced at least a dozen hull separations with Federal Cartridge shotgun shells and has retained physical examples of some of these.[54]

43.     Mr. Roster, reviewed and considered the evidence, including physical evidence, and the observations and testimony of witnesses at the scene, to understand the sequence of

---

[50] Id. at 6, ¶ 3 (citing Roster Deposition at 182:17-188:22, 193:4-14).

[51] Id. at 9, ¶ 2 (citing Roster Deposition at 221:6-21).

[52] Id. at 7, ¶ 4 (citing Roster Deposition at 73:16-74:7).

[53] Opposition at 8, ¶ 13 (citing Roster Affidavit ¶ 3).

[54] Id. at 8-9, 17, ¶¶ 14, 53 (citing Roster Deposition at 149:10-24, 150:6-19, 184:11-16; Roster Affidavit ¶ 2).

events concerning Mr. Barben's shots and determine what possible scenarios could account for the barrel explosion.[55]

44. As relevant to Mr. Roster's conclusions, the physical evidence included the shotgun, including its failure point, and measurements taken thereof; the ammunition box purchased on the day of the hunting party, including measurements and investigation of one of the rounds from the box; shotgun shell components recovered from the scene of the explosion, including the spent hull from Mr. Barben's second shot, which was removed from Mr. Barben's gun by the hunting guide immediately after the explosion; and a plastic hull, separated from the metal head, bearing impressions that appear to Mr. Roster as to having been created by the plastic hull being struck by a group of bbs.[56]

45. As relevant to Mr. Roster's conclusions, the witness's testimony included consistencies from the six witnesses at the site—that Mr. Barben shot, then broke the action to eject the spent shell, reloaded, closed the action, walked a short distance, and fired the shot that exploded.[57]

46. Mr. Roster concluded that the first Federal Cartridge shell Mr. Barben fired was defective and experienced a hull separation, which allowed the plastic hull (and possibly other shell components) to become lodged in the shotgun's barrel instead of being expelled with the metal head when Mr. Barben broke the action after his first shot. This obstruction was then struck by Mr. Barben's second shot, causing the shot to explode out the side of the barrel.[58]

---

[55] *Id*. at 14, ¶ 44 (citing Roster Report at 1, 10-11); Reply at 31-32, ¶ 44 (citing Roster Deposition at 119:10-25, 138:1-139:4, 164:4-14, 167:4-168:9, 243:15-244:3, 261:1-24).

[56] Opposition at 15, ¶ 45 (citing Roster Report at 1, 10-12).

[57] *Id*. at 15, ¶ 46 (citing Roster Report at 10-11; Affidavit of Brian Smith ("Smith Affidavit") ¶¶ 2-13, docket no. 35-6, filed Oct. 26, 2017; Affidavit of Mark Braddy ("Braddy Affidavit") ¶¶ 2-13, docket no. 35-7, filed Oct. 26, 2017); Reply at 33-34, ¶ 46 (citing Smith Affidavit; Braddy Affidavit).

[58] Opposition at 15, ¶ 47 (citing Roster Deposition at 88:11-89:9, 102:2-11, 160:3-161:19, 245:19-246:6).

47.     Mr. Roster considered the possibility that Mr. Barben loaded a 20-gauge shell instead of a 12-gauge shell and concluded that this was inconsistent with the physical evidence and the sequence of events, as attested by the witnesses at the site.[59]

48.     Mr. Roster concluded that the sequence of events and his examination of the unfired 12-gauge rounds and the shotgun—without considering the plastic hull found separated from its metal head at the site—allow him to conclude with certainty that no other explanation can exist for the barrel explosion.[60]

49.     Mr. Roster testified that the later recovered plastic hull from the site, if it was the hull from Mr. Barben's first shot that separated and became lodged in the barrel, adds further support to his conclusion.[61]

50.     Hull separations can occur for a few reasons, including but not limited to: the metal head not being sufficiently crimped onto the plastic hull; the metal head partially splitting upon firing, causing it to lose its grip on the plastic hull; problems with the shape or construction of the base wad, which allows expanding powder gases to forcefully blow between the exterior of the base wad and the interior of the plastic hull wall or the interior of the metal head, causing the metal head and plastic hull to separate; and the plastic hull being cut or severed completely around its circumference at the top edge of the metal head's skirt.[62]

51.     Hull separations can be undetectable to a sportsman, even if he or she sights down the barrel after a shot. The plastic hull—having discharged its contents through the front folded

---

[59] *Id*. at 15, ¶ 48 (citing Roster Deposition at 246:7-248:17).

[60] *Id*. at 16, ¶ 50 (citing Roster Deposition at 193:12-14).

[61] *Id*. at 17, ¶ 51 (citing Roster Deposition at 244:24-245:18, 256:19-257:12).

[62] *Id*. at 17, ¶ 54 (citing Roster Deposition at 183:15-184:16; Roster Report at 12-14)); Reply at 36-37, ¶ 54 (citing Roster Deposition at 181:16-182:10).

end and having separated from its metal head—becomes a cylinder, the thin sides of which conform to the barrel wall, making the barrel appear clear.[63]

52.    Mr. Roster does not know precisely why this specific hull separation occurred, but he has concluded that the evidence allows for no other explanation for the barrel explosion than a hull separation.[64]

## DISCUSSION

Federal Cartridge argues that it is entitled to summary judgment on each of Mr. Barben's claims because he has failed to present evidence that (1) a defect exists in the manufacture, design, or warnings of Federal Cartridge's ammunition; (2) Federal Cartridge failed to use reasonable care in the manufacture, design, testing, inspection, sale, distribution, and advertising of its ammunition; and (3) Federal Cartridge's ammunition contains any express warranty with regard to being free from defects, of merchantable quality and safe, or fit for its general, intended and reasonably foreseeable purpose and uses.[65] Mr. Barben argues that while he cannot point to a specific defect, Mr. Roster's expert opinion and the circumstantial evidence permit an inference of a defect in Federal Cartridge's ammunition and negligence on the part of Federal Cartridge, which preclude summary judgment.[66]

"Products liability always requires proof of a defective product, which can include manufacturing flaws, design defects, and inadequate warnings regarding use."[67] "Alternative theories are available to prove different categories of defective product, including negligence,

---

[63] Opposition at 17-18, ¶ 55 (citing Roster Deposition at 96:14-97:2).

[64] *Id*. at 18, ¶ 57 (citing Roster Deposition at 193:12-14).

[65] Motion for Summary Judgment at 11-17.

[66] Opposition at 20-24.

[67] *Bishop v. GenTec, Inc.*, 48 P.3d 218, 225 (Utah 2002) (internal quotations omitted).

strict liability, or implied warranty of merchantability."[68] "Whatever the theory, however, the

defendant's liability is for the defective product, and not merely for any underlying

negligence."[69]

### Genuine issues of material fact preclude summary judgment on Mr. Barben's strict liability (defective manufacture) and breach of implied warranty claims

"The elements of both [strict products liability and breach of implied warranty of

merchantability claims] are essentially the same and analysis for the purpose of determining

defenses to breach of implied warranty parallels that for strict products liability."[70] Therefore,

Mr. Barben's strict liability and breach of implied warranty claims are analyzed together.

"In order to prevail on a claim for strict products liability, the plaintiff must meet a

three-part test."[71] "The plaintiff must show '(1) that the product was unreasonably dangerous due

to a defect or defective condition, (2) that the defect existed at the time the product was sold, and

(3) that the defective condition was a cause of the plaintiff's injuries.'"[72] "It is not enough to

merely contend that a defect existed, show that an accident occurred, and assume the two are

necessarily related."[73]

Mr. Barben has presented sufficient evidence to create an inference that Federal

Cartridge's ammunition was unreasonably dangerous due to a manufacturing defect, and that this

---

[68] *Id*. at 225-26.

[69] *Id*. at 226.

[70] *Ernest W. Hahn, Inc. v. Armco Steel Co.*, 601 P.2d 152, 159 (Utah 1979) (citing Prosser, The Assault Upon the Citadel, 69 Yale L.J. 1099 (1960); Epstein, PRODUCTS LIABILITY: DEFENSES BASED ON PLAINTIFF'S CONDUCT, 1968 Utah L.Rev. 267); *see also Kirkbride v. Terex USA, LLC*, 798 F.3d 1343, 1354 (10th Cir. 2015).

[71] *Burns v. Cannondale Bicycle Co.*, 876 P.2d 415, 418 (Utah Ct. App. 1994).

[72] *Id*. (quoting *Lamb v. B & B Amusements Corp.*, 869 P.2d 926, 929 (Utah 1993).

[73] *Id*. A product is "unreasonably dangerous" if it "was dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer, or user of that product in that community considering the product's characteristics, propensities, risks, dangers, and uses together with any actual knowledge, training, or experience possessed by that particular buyer, user, or consumer." Utah Code Ann. § 78B-6-702.

defect caused his injuries. He does not identify a specific manufacturing defect in Federal Cartridge's ammunition. This is because the entire Federal Cartridge shell that Mr. Barben fired was not recovered from the site of the barrel explosion.[74] However, Mr. Barben offers the expert opinion of Mr. Roster that the barrel explosion resulted from a barrel obstruction caused by a defective Federal Cartridge shotgun shell that experienced a hull separation.[75] This opinion is based on Mr. Roster's specialized experience and knowledge, as well as his review of the physical evidence and witness statements.[76] Mr. Roster concluded that the defect was a manufacturing defect,[77] and he identified multiple ways in which the manufacturing defect could have occurred.[78] Additionally, in forming his opinion, Mr. Roster excluded other potential causes of the barrel explosion, such as Mr. Barben loading a 20-gauge shell instead of a 12-gauge shell.[79]

Federal Cartridge makes much of the fact that Mr. Roster cannot pinpoint the precise defect and did not know the shell's condition when it left Federal Cartridge's factory, as well as his acknowledgment that something could have happened to the shell after the manufacturing process was complete.[80] But "[a] ruling that proof of defect is unattainable as a matter of law in circumstances such as these would effectively establish a conclusory presumption of non-liability in favor of strict product liability defendants whose products self-destruct in the

---

[74] *Supra* at Undisputed Material Facts ¶¶ 38-32.

[75] *Id*. ¶ 46.

[76] *Id*. ¶¶ 33, 41-45, 49, 52.

[77] *Id*. ¶¶ 36-37.

[78] *Id*. ¶ 50.

[79] *Id*. ¶¶ 47-48.

[80] Motion for Summary Judgment at 13-14; Reply at 41-47; *see also supra* at Undisputed Material Facts ¶¶ 38, 50, 52.

process of causing injury to persons or property."[81] Such a conclusory presumption is not appropriate under the circumstances of this case.[82]

"The underlying principle that circumstantial evidence may create inferences of fact which are not otherwise subject to direct proof is entirely consonant with a strict liability theory."[83] "The inference of a defect is permissible whenever the plaintiff has introduced evidence that would exclude other causes of the accident."[84] Moreover, "[e]vidence offered by the defendant that is contrary to the evidence offered by the plaintiff creates a question for the jury; it does not prevent the jury from relying upon the plaintiff's evidence and inferring a defect."[85] "An inference need not be justified beyond all doubt and is not precluded by a mere possibility that the contrary may be true."[86]

Mr. Roster's expert opinion is sufficient to create an inference that Federal Cartridge's ammunition was unreasonably dangerous due to a manufacturing defect, and that this defect caused Mr. Barben's injuries. Therefore, genuine issues of material fact exist on Mr. Barben's strict liability (defective manufacture) and breach of implied warranty claims, which preclude summary judgment on these claims.

---

[81] *Weir v. Fed. Ins. Co.*, 811 F.2d 1387, 1392 (10th Cir. 1987) (quoting *Union Ins. Co. v. RCA Corp.*, 724 P.2d 80, 83 (Colo. Ct. App. 1986)).

[82] *Id.*; *see also St. Paul Fire & Marine Ins. Co. v. Michelin Tire Corp.*, 298 N.E.2d 289, 297-98 (Ill. App. Ct. 1973).

[83] *Michelin Tire Corp.*, 298 N.E.2d at 298.

[84] *Weir*, 811 F.2d at 1392.

[85] *Id.*

[86] *Id.* (quoting *Fain v. GTE Sylvania, Inc.*, 652 S.W.2d 163, 165 (Mo. Ct. App. 1983)).

<h2 style="text-align:center">Federal Cartridge is entitled to summary judgment on<br>Mr. Barben's strict liability (defective design) claim</h2>

In addition to the three-part test for strict products liability claims,[87] to prevail on a design defect claim, the plaintiff "bear[s] the burden of showing that an alternative, safer design, practicable under the circumstances, was available at the time the [product was] sold."[88]

It is undisputed that since 2010, Federal Cartridge has manufactured over 130 million H121 shells, and over 30 million of the H121 6 shells Mr. Barben was using when his shotgun's barrel exploded.[89] It is also undisputed that there are no reports of any other alleged hull separations from either internal testing or external field complaints for Federal Cartridge's H121 shells.[90] Additionally, Mr. Roster's expert report contains no opinions regarding a design defect or an alternative, safer design.[91] And Mr. Roster testified that, in his opinion, there was no design defect with the ammunition Mr. Barben used.[92] While Mr. Roster is aware of, and has personally experienced, hull separations with Federal Cartridge's shells,[93] he testified these events did not involve H121 shells.[94] Even considering Mr. Roster's testimony regarding Federal Cartridge's other shell types, the sheer number of H121 shells manufactured compared to the minute number of hull separation events cannot support a reasonable inference of a design defect.

Mr. Barben has produced insufficient evidence to support a reasonable inference of a design defect in Federal Cartridge's ammunition. He has also offered no evidence showing that

---

[87] *Burns*, 876 P.2d at 418.

[88] *Allen v. Minnstar, Inc.*, 8 F.3d 1470, 1479 (10th Cir. 1993).

[89] *Supra* at Undisputed Material Facts ¶ 5.

[90] *Id*. ¶ 6.

[91] *Id*. ¶ 36.

[92] *Id*. ¶¶ 36-37.

[93] *Id*. ¶¶ 33, 41-42.

[94] Roster Deposition at 150:6-151:14.

an alternative, safer design existed. Therefore, because Mr. Barben has failed to establish a genuine issue of material fact as to an element essential to his strict liability (defective design) claim, Federal Cartridge is entitled to judgment as a matter of law on this claim.

### Federal Cartridge is entitled to summary judgment on Mr. Barben's strict liability (defective warning) claim

"[U]nder Utah law, a manufacturer may be held strictly liable for any physical harm caused by its failure to provide adequate warnings regarding the use of its product."[95] "Where a manufacturer knows or should know of a risk associated with its product, the absence or inadequacy of warnings renders that product 'unreasonably dangerous,' subjecting the manufacturer to strict liability."[96] However, "[i]n any failure to warn claim, a plaintiff must show that the failure to give an adequate warning in fact caused the injury; i.e., that had warnings been provided, the injured party would have altered his use of the product or taken added precautions to avoid injury."[97] "[I]f the event which produced the injury would have occurred regardless of the defendant's conduct, then the failure to provide a warning is not the proximate cause of the harm and the plaintiff's claim must fail."[98]

Mr. Barben's theory of causation is that the barrel explosion resulted from a barrel obstruction caused by a defective Federal Cartridge shotgun shell that experienced a hull separation.[99] It is undisputed that the packaging for Federal Cartridge's H121 6 shells provides the following warning regarding barrel obstructions:

---

[95] *House v. Armour of Am., Inc.*, 929 P.2d 340, 343 (Utah 1996).

[96] *Id.* (internal quotations omitted); *see also Slisze v. Stanley-Bostitch*, 879 P.2d 317, 321 (Utah 1999) ("A manufacturer has a duty to warn against a product's latent hazards that are known to the manufacturer but unknown to the consumer.").

[97] *House*, 929 P.2d at 346.

[98] *Id.*

[99] *Supra* at Undisputed Material Facts ¶ 46.

WARNING: to avoid serious injury . . . (2) always be sure barrel is free of any obstructions; the barrel should be checked in case of light recoil, or an unusually loud or weak sound heard during firing.[100]

This warning is conspicuously located on the side of the product's packaging.[101] While not explicitly warning of the possibility of a hull separation, this broad language adequately notifies consumers of the danger in using the ammunition any time the shotgun's barrel is obstructed, which includes obstructions caused by a hull separation.

The warning is particularly adequate with respect to sophisticated users like Mr. Barben, who is an experienced sportsman with advanced knowledge of firearms, firearm operation, and firearm safety.[102] Mr. Barben knew that gun barrels can become obstructed, and that there are "a lot of things that could cause an obstruction."[103] He also knew of the warnings to check the barrel for obstructions before firing.[104] It is immaterial whether Mr. Barben knew the ammunition could potentially suffer a hull separation because it is undisputed that he knew the danger associated with firing a shotgun that has an obstructed barrel.[105] Indeed, Mr. Barben testified that had he checked the barrel, he "probably would have seen [the obstruction]" and not fired.[106] Therefore, Mr. Barben has produced insufficient evidence to support a reasonable inference that the absence of an explicit warning regarding the possibility of a hull separation rendered the product unreasonably dangerous.

---

[100] *Id.* ¶ 7.

[101] Photographs of Product Packaging.

[102] *Supra* at Undisputed Material Facts ¶¶ 8-9, 12-14, 40.

[103] *Id.* ¶¶ 12-13.

[104] *Id.* ¶ 14.

[105] *Id.* ¶¶ 13-14, 17.

[106] *Id.* ¶ 17.

Mr. Barben has also failed to produce sufficient evidence to support a reasonable inference that the inadequacy of Federal Cartridge's warning was the proximate cause of his injuries. Mr. Barben testified that warnings to check for barrel obstructions are unreasonable because they are impractical in a hunting environment.[107] This testimony demonstrates that a "heeding presumption"—a rebuttable presumption that Mr. Barben would have followed an adequate warning had one been provided—is inappropriate under the circumstances.[108] Mr. Barben chooses not to follow these warnings while hunting and offers no evidence to suggest he would have altered his conduct or taken added precautions to avoid injury if he was warned of the possibility of a hull separation. He is well aware "a lot of things . . . could cause an obstruction."[109] A hull separation is just one more of those things. Because Mr. Barben has failed to establish a genuine issue of material fact as to an element essential to his strict liability (defective warning) claim, Federal Cartridge is entitled to judgment as a matter of law on this claim.

### Federal Cartridge is entitled to summary judgment on Mr. Barben's negligence claim

Negligence is "a failure to exercise the degree of care which a reasonable person would have exercised under the same circumstances, whether by acting or by failing to act."[110] "In cases where the alleged negligence consists of a failure to act, the person injured by another's

---

[107] *Id.* ¶ 16.

[108] *House*, 929 P.2d at 347 ("[I]n cases in which it cannot be demonstrated what the plaintiff would have done had he or she been adequately warned, the plaintiff should be afforded a rebuttable presumption that he or she would have followed an adequate warning had one been provided . . . The heeding presumption . . . serves to reinforce the basic duty to warn-to encourage manufacturers to produce safer products, and to alert users of the hazards arising from the use of those products through effective warnings.") (internal quotations omitted).

[109] *Supra* at Undisputed Material Facts ¶¶ 12-13.

[110] *Barson By and Through Barson v. E.R. Squibb & Sons, Inc.*, 682 P.2d 832, 835 (Utah 1984) (internal quotations omitted).

inaction must demonstrate the existence of some special relationship between the parties creating a duty on the part of the latter to exercise such due care in behalf of the former."[111]

A plaintiff claiming negligence in the context of products liability must prove "there was a duty owed by the defendant to the plaintiff, that the duty was breached and that the conduct complained of was the cause in fact of the injury."[112] Mr. Barben fails to establish that Federal Cartridge owed him a duty of reasonable care. And, even assuming such a duty exists, Mr. Barben has failed to produce sufficient evidence to support a reasonable inference that Federal Cartridge breached its duty.

Four factors are considered "when ascertaining whether a duty of reasonable care exists: (1) the extent that the manufacturer could foresee that its actions would cause harm; (2) the likelihood of injury; (3) the magnitude of the burden of guarding against it; and (4) the consequences of placing the burden on the defendant."[113]

Mr. Barben makes no attempt to apply these factors to the facts of this case. Regardless, it is undisputed that ammunition manufacturers are or should be aware that hull separations can occur.[114] It is reasonable to infer that Federal Cartridge was aware or should have been aware of this phenomenon. Therefore, it is reasonably foreseeable that Federal Cartridge's conduct in the manufacture, design, testing, inspection, sale, distribution, and advertising of its ammunition could cause Mr. Barben's harm.

However, since 2010, Federal Cartridge has manufactured over 130 million H121 shells, 30 million of which were the sub-type Mr. Barben was using when his shotgun's barrel

---

[111] *Id*. (internal quotations omitted).

[112] *Id*.

[113] *Slisze*, 879 P.2d at 320.

[114] *Supra* at Undisputed Material Facts ¶¶ 3, 41.

exploded.[115] There are no reports of any other alleged hull separations from either internal testing or external field complaints in that time;[116] though Mr. Roster is aware of, and has experienced, hull separations with other types of Federal Cartridge's shells.[117] Considering the number of H121 shells manufactured by Federal Cartridge, hull separation events are rare. This fact is not disputed.[118] Moreover, Federal Cartridge warns consumers to check for barrel obstructions to avoid serious injury.[119] Despite the possibility that an obstruction from a hull separation may be undetectable from looking down a barrel,[120] the hull separation obstructions Mr. Roster is aware of and has experienced have been discovered and cleared before they could cause a barrel explosion.[121] Mr. Barben also testified that had he checked the barrel, he "probably would have seen [the obstruction]" and not fired.[122] Given these facts, the likelihood of injury is remote.

Additionally, there is no direct evidence concerning the magnitude of the burden Federal Cartridge would have in guarding against hull separations. But given the vast number of shells Federal Cartridge produces and the rarity of hull separation events, it is reasonable to infer that the consequences of placing the burden of guarding against hull separations on Federal Cartridge are too great.

---

[115] *Id.* ¶ 5.

[116] *Id.* ¶ 6.

[117] *Id.* ¶¶ 33, 41-42.

[118] *Id.* ¶ 41.

[119] *Id.* ¶ 7.

[120] *Id.* ¶ 51.

[121] Roster Deposition at 151:15-152:12, 180:25-181:12.

[122] *Supra* at Undisputed Material Facts ¶ 17.

In considering the four factors for determining whether a duty of reasonable care exists, Mr. Barben has failed to demonstrate that Federal Cartridge owed him a duty of reasonable care in the manufacture, design, testing, inspection, sale, distribution, and advertising of its ammunition. "[T]here has been no showing that the likelihood of injury would be reduced enough to outweigh the costs and burdens"[123] that imposing a duty would have on Federal Cartridge. "[T]here is no duty to make a safe [product] safer."[124] Therefore, as a matter of law, Federal Cartridge owed no duty of reasonable care to Mr. Barben.

Nevertheless, assuming Federal Cartridge had such a duty, the undisputed material facts cannot support a reasonable inference of negligence on the part of Federal Cartridge in its manufacture, design, testing, inspection, sale, distribution, and advertising of its ammunition. Federal Cartridge has manufactured over 130 million H121 shells since 2010, 30 million of which were the sub-type Mr. Barben was using when his shotgun's barrel exploded.[125] There are no reports of any other alleged hull separations from either internal testing or external field complaints over that time.[126] Additionally, Mr. Roster testified that he "ha[s] no evidence that [Federal Cartridge] didn't" use reasonable care in designing, manufacturing, testing or inspecting its ammunition.[127] Mr. Barben has produced no evidence suggesting that Federal Cartridge failed to exercise reasonable care and an inference of negligence in not appropriate based on the undisputed material facts. Therefore, Federal Cartridge is entitled to summary judgment on Mr. Barben's negligence claim as a matter of law.

---

[123] *Slisze*, 879 P.2d at 320.

[124] *Id*. (internal quotations omitted).

[125] *Supra* at Undisputed Material Facts ¶ 5.

[126] *Id*. ¶ 6.

[127] *Id*. ¶ 39.

### Federal Cartridge is entitled to summary judgment on
### Mr. Barben's breach of express warranty claim

"A warranty is an assurance by one party to a contract of the existence of a fact upon which the other party may rely."[128] "It is intended to relieve the promise of any duty to ascertain the fact for himself, and it amounts to a promise to answer in damages for any injury proximately caused if the fact warranted proved untrue."[129] Claims for "breach of warranty sound[] in strict liability [and do] not require that the person making the representation or promise be aware that it is false[.]"[130] "[A]nd a person may be liable for breach of warranty despite his exercise of all reasonable or even all possible care."[131]

"An express warranty does not require any particular words."[132] "Any direct and positive affirmation of fact, as distinguished from mere opinion or judgment, made by one party to the contract that induces the other party to act in reliance thereon constitutes an express warranty."[133]

Mr. Barben has presented no evidence of an express warranty made by Federal Cartridge regarding its ammunition. Therefore, Federal Cartridge is entitled to summary judgment on Mr. Barben's breach of express warranty claim as a matter of law.

### ORDER

IT IS HEREBY ORDERED that:

1.      Federal Cartridge's Motion for Summary Judgment[134] is DENIED as to Mr. Barben's strict liability (defective manufacture) and breach of implied warranty claims;

---

[128] *Groen v. Tri-O-Inc.*, 667 P.2d 598, 604 (Utah 1983).

[129] *Id.*

[130] *Id.*

[131] *Id.*

[132] *Id.* at 606.

[133] *Id.*

[134] Docket no. 32, filed Sept. 29, 2017.

2.      Federal Cartridge's Motion for Summary Judgment[135] is GRANTED as to Mr.

Barben's strict liability (defective design and warning), negligence, and breach of express

warranty claims; and

3.      Mr. Barben's strict liability (defective design and warning), negligence, and

breach of express warranty claims are DISMISSED with prejudice.

Signed December 18, 2017.

BY THE COURT

David Nuffer
United States District Judge

---

[135] *Id.*